**VENTANA INVESTMENTS, A TEXAS GENERAL PARTNERSHIP, Pride House Care Corp., The Britwill Company, and Bruce H. Whitehead, Individually, Plaintiffs,**

v.

**909 CORPORATION, f/k/a Underwood, Neuhaus, & Co., Inc., Kemper Financial Companies, Inc., Lovett, Mitchell, Webb & Garrison, Inc., Franklin Financial Services, Inc. and William Sorenson, Defendants,**

v.

**RESOLUTION TRUST CORPORATION, as Conservator for Franklin Federal Savings Association, Intervenor.**

**No. 1:93–CV–0495.**

United States District Court, E.D. Texas, Beaumont Division.

Nov. 23, 1994.

---

Carl A. Parker, Port Arthur, TX, Morris C. Gore, Dallas, TX, for Ventana.

Tanner T. Hunt, Bruce Partain, Wells Peyton Beard Greenberg Hunt & Crawford, Beaumont, TX, Patrick Zummo, Carolyn Southerland, Baker & Botts, Houston, TX, Barbara J. Barron, Mehaffy & Weber, Beaumont, TX, for defendants.

### MEMORANDUM OPINION

COBB, District Judge.

### INTRODUCTION

The Plaintiffs, Ventana Investments, Pride House Care Corporation, and Bruce H. Whitehead (hereinafter collectively referred to as "Ventana"), filed this suit alleging breach of contract, fraud, violations of the

Texas Deceptive Trade Practices Act ("DTPA"), estoppel, and breach of fiduciary duty. The plaintiffs ask this court to grant summary judgment for the breach of contract, estoppel, and breach of fiduciary duty.

Defendants, Underwood, Neuhaus & Co., Kemper Financial Companies, Inc., Lovett Mitchell, Webb & Garrison, Inc., Franklin Financial Services, Inc., and William Sorenson (hereinafter collectively referred to as "Underwood"), also filed a motion for summary judgment. Underwood asks this court to grant summary judgment on plaintiffs' claims of misrepresentation, fraud, breach of contract, Texas' Deceptive Trade Practices Act. In addition, defendant, Underwood, Neuhaus & Company, Inc., filed a counterclaim seeking to enforce and collect two notes from plaintiffs Bruce H. Whitehead and Ventana Investments. Defendants also asks this court to grant summary judgment on this counterclaim based on the express writings of the notes that state that the notes are due and owing.

### 1. Facts

Ventana, a Texas general partnership, entered into an agreement with Underwood in late March 1989.[1] Underwood is a Texas close corporation whose principal place of business was Ottawa, Kansas. Underwood is currently in dissolution. Franklin Federal Savings Association (FFSA) owns Franklin Financial Services, Inc., which owns Underwood as a subsidiary. FFSA is presently in conservatorship with the Resolution Trust Corporation (RTC) acting as conservator. The RTC sold, assigned, transferred, conveyed and delivered assets of FFSA to a newly created association. Underwood was included in these assets transferred by the RTC.

Underwood agreed to render investment banking services to Ventana for Ventana's acquisition of approximately eighty-five (85) nursing homes in the states of Iowa and Arkansas. Underwood received a percentage of the total financing provided.

The first transaction between Ventana and Underwood involved the purchase of forty-five (45) Iowa health care facilities. Underwood placed the bonds issued for the transaction with various investors. Ventana purchased these facilities from Beverly Enterprises and resold them to Mercy Health Initiatives ("Mercy"). Ventana contends that the Iowa and Arkansas deal were considered a single transaction. Ventana allegedly obtained commitments from Underwood to close the Iowa portion of the transaction by July 1, 1989 and the Arkansas portion of the transaction by August 1, 1989 in order to "take advantage of a hot market" for tax exempt bonds. A letter from the First Vice-President of Underwood, Terry Colip ("Colip") indicated that Underwood recognized and accepted Ventana's timetable for these transactions.

Two notes were executed. A note for $100,000 specifically stated that it was due and payable at the closing of the Iowa bond issuance. The second note stated that $700,000 was due and payable in full on June 1, 1990, or upon consummation of the purchase of the Arkansas facilities, whichever occurred first.

The Iowa transaction closed on or about August 1, 1989 with Underwood earning approximately seven (7) million dollars in fees. Ventana paid only $50,000 of the $100,000 note dated May 22, 1989. A few days later, Underwood changed management personnel. The Chief Executive Officer ("CEO"), Michael Gibbons, resigned. The new CEO, William Sorenson, began re-evaluating the firm's existing business commitments.

Ventana became concerned about Underwood's ability to meet its financial obligations due to these management changes. Consequently, Ventana asked to substitute Donaldson, Lufkin, and Jenrette ("DLJ") as the underwriter for the Arkansas transaction. Sorenson verbally refused to allow Ventana to substitute underwriters. On September 11, 1989, Whitehead sent a letter confirming Sorenson's refusal to allow DLJ to substitute as underwriters. Sorenson never responded to the letter.

Judge John Harkey threatened litigation over this transaction alleging that the bond

---

1. Underwood changed its name to 909 Corporation in 1989.

issuance would not benefit the people of Arkansas. Judge. Harkey was an extremely influential player in the various financial deals that involved bond issuances and other transactions in Arkansas. However, Judge Harkey withdrew this threat as confirmed by a letter dated September 18, 1989.

On September 21, 1989, the Arkansas Development and Finance Authority ("ADFA") approved the Arkansas transaction with Underwood as the underwriter and issued an authorizing resolution. The transaction still required final approval of the ADFA as well as the signature of then Governor Clinton.

Underwood withdrew from this transaction on or about September 25, 1989. Within one day of Underwood's withdrawal, Ventana hired DLJ as a replacement. In spite of this timely replacement of underwriters, Ventana alleges that the withdrawal of Underwood necessarily required that the transaction be resubmitted to the ADFA, denoting DLJ as the new underwriter. Ventana claims that, had Underwood not withdrawn, the bonds for the Arkansas transaction would have been issued soon after the initial approval on September 21, 1989.

By the time the ADFA met again to consider the bond proposal, the bond issue had become a tumultuous political issue. Many political players seized the proposal as an example of business people from other states exploiting the people of Arkansas for their own gain. Governor Clinton also entered battle against the proposal by stating that he would not sign the proposal even if the ADFA approved the transaction.

Ventana argues that Underwood's withdrawal and the subsequent re-submission of the proposed transaction to the ADFA subjected it to the political turmoil that occurred a month before the November elections. Ventana could not overcome these political obstacles and regain ADFA approval.

Since the Arkansas transaction was not consummated, the second note was due and payable by its terms on June 1, 1990. Ventana did not pay the second note for $700,000 after the June 1, 1990 contract date.

Underwood contends that its withdrawal as underwriter did nothing to change the outcome of the proposed bond issuance because no final approval had been officially granted. Underwood asserts that the political backlash from the proposed transaction would have prevented the ADFA from granting final approval irrespective of its status as an underwriter. Underwood also contends that the remaining $50,000 of the first $100,000 note and the $700,000 note are now due and payable under the express provisions of the respective promissory notes.

### 2. Jurisdiction and Standard of Review

The Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of 1989 grants this court jurisdiction over all actions, suits, or proceedings to which the Resolution Trust Corporation (RTC) is a party. 12 U.S.C. § 1441a($l$)(1). Section 1441a($l$)(1) provides that:

> Notwithstanding any other provision of law, any civil action, suit, or proceeding to which the Corporation is a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction over such action, suit, or proceeding.

12 U.S.C. § 1441a($l$)(1).

Summary judgment is appropriate when the movant is able to demonstrate that the pleadings, affidavits, and other evidence available to the Court establish that there are no genuine issues of material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c); See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); and *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–88, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). When the nonmoving party has the burden of proof on an issue, the movant must state the basis for the motion and identify those portions of the pleadings, depositions, admissions, answers to interrogatories, together with affidavits, that demonstrate the absence of a genuine

**728**

issue of material fact.[2] *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553; *Topalian v. Ehrman,* 954 F.2d 1125, 1131–32 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). A mere conclusory statement that the other side has no evidence is not enough to satisfy a movant's burden. *See Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

Once the movant demonstrates that the case presents no material fact issues, the opposing party has a duty to respond, via affidavits or other means, asserting specific facts that show that there is a genuine issue of material fact for trial. Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514; *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. The Court must view the evidence introduced and all factual inferences from the evidence in the light most favorable to the party opposing summary judgment. *Eastman Kodak v. Image Technical Services,* —— U.S. ——, ——, 112 S.Ct. 2072, 2077, 119 L.Ed.2d 265 (1992); *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. However, a party opposing summary judgment may not rest on mere conclusory allegations or denials in his pleadings. Fed.R.Civ.P. 56(e); *see also Topalian,* 954 F.2d at 1131.

Genuine issues of material fact are not disputed and summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for a non-moving party...." *Leonard v. Dixie Well Service Supply, Inc.,* 828 F.2d 291, 293–94 (5th Cir.1987). It is important to note that "one of the principle purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2553.

### 3. Enforcement and Collection of the Notes

■ Ventana executed two promissory notes to be paid to Underwood. The first note specifically states that the sum of $100,-

000 is payable at the closing of the Iowa transaction, August 1, 1989. The second promissory note states that $700,000 is due and payable with interest on June 1, 1990, or on consummation of the Arkansas revenue bond issue.

Plaintiffs contend that the doctrine of mutual mistake should be applied and that the contract should be reformed to reflect the agreement of the parties. Plaintiffs assert that Mr. Whitehead's affidavit supports the contention that the repayment of the notes were actually contingent on the closing of the Arkansas bond issue.

Defendants' contend that summary judgment is appropriate because no competent summary judgment evidence exists to support plaintiffs mutual mistake allegations. The express provisions of the notes establish that both notes are due and payable. As such, defendants assert that reformation of the notes is unnecessary.

■ Well settled Texas law presumes that "a written agreement correctly embodies the parties' intentions, and is an accurate expression of the agreement the parties reached in prior oral negotiations." *St. Paul Lloyd's Ins. v. Fong Chun Huang,* 808 S.W.2d 524, 527 (Tex.App.—Houston [14th Dist.] 1991, writ denied) (citing *Estes v. Republic Nat'l Bank of Dallas,* 462 S.W.2d 273, 275 (Tex.1970)). Reformation of a written agreement corrects mutual mistakes made in the preparation of the written document to ensure that the instrument accurately reflects the original agreement of the parties. *Cherokee Water Co. v. Forderhause,* 741 S.W.2d 377, 379 (Tex.1987). The party seeking reformation must prove: (1) what the original agreement truly contained and (2) that the terms of the written agreement differed from the original agreement because of a mutual mistake between the parties. *Sun Oil Co. v. Bennett,* 84 S.W.2d 447, 451 (Tex. 1935). Reformation is unavailable unless the party claiming mistake presents "clear, exact, and satisfactory evidence." *Id.* at 452;

---

2. A "material" fact is one that might affect the outcome of the suit under the applicable substantive law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. In order for a dispute to be "genuine," the evidence before the Court must be such that

a reasonable jury could return a verdict for the nonmoving party. *Id., See also, Judwin Properties, Inc. v. United States Fire Ins. Co.,* 973 F.2d 432, 435 (5th Cir.1992).

*See also St. Paul Lloyd's Ins.,* 808 S.W.2d at 527.

Plaintiffs offer no clear, exact or satisfactory evidence to contradict the express language of the loan agreement. Ventana submits the affidavit of Bruce Whitehead in support of its contention that the original agreement provided that the second note would not be due until after the closing of the Arkansas transaction. However, this allegation is insufficient to controvert the terms of the agreement. As an interested party, Bruce Whitehead's affidavit does not present the evidence required to successfully reform the written agreement. No evidence of any other written agreement exists that modifies the terms of the notes. Unsupported affidavits that set forth ultimate facts are insufficient to defeat a motion for summary judgment. *Orthopedic & Sports Injury Clinic v. Wang,* 922 F.2d 220, 225 (5th Cir.1991).

Plaintiffs presented no evidence, other than the affidavit, to prove the terms of the alleged original agreement. No other evidence existed to show that a mutual mistake occurred. For these reasons, no genuine issue of material fact exists. Plaintiffs failed to meet the two part test for reforming a written contract under *Sun Oil* and defendants are entitled to summary judgment on the issue of whether the two notes executed by Ventana and Underwood are due and payable. The express language of the agreements show that the remaining $50,000 of the $100,000 note and the $700,000 note are now due and payable. Defendants' counterclaim for enforcement and collection of the two notes is hereby GRANTED.

### 4. Breach of Contract

■ Ventana asserted a cause of action based on a breach of contract theory. Ventana alleges that Underwood agreed to perform underwriting services for the Arkansas nursing home bond issue. The contract was allegedly breached when Underwood withdrew as the underwriter a few days after the ADFA issued an initial approval for the transaction. Underwood's withdrawal required Ventana to resubmit the proposal to the ADFA for reapproval with DLJ as the new underwriters. Subsequent political events caused the ADFA to refuse to re-approve the transaction.

A valid and binding contract or agreement must exist in order to reach the issue of whether a breach of contract occurred. Ventana contends that an agreement existed for Underwood to underwrite the Arkansas bond issuance.

However, the underwriting of a bond proposal constitutes the sale of "certificated securities" for purposes of the Texas Business & Commerce Code section 8.102. As such, any agreement to underwrite bonds also falls within Texas Business & Commerce Code section 8.319. Section 8.319 provides that:

> A contract for the sale of securities is not enforceable by way of action or defense unless:
>
> (1) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker, sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price;

Tex.Bus. & Com.Code Ann. § 8.319 (Vernon 1991).

■ In contracts for the sale of securities, the Statute of Frauds requires a writing that specifies quantity and price. *Gannon v. Baker,* 830 S.W.2d 706, 710 (Tex.App.—Houston [1st Dist.] 1992, writ denied). In the present case, no writing existed that could satisfy the Statute of Frauds. The only written evidence of an agreement was the initial approval by the ADFA that specified Underwood as the underwriter for the transaction. At most, any agreement between Ventana and Underwood was an agreement to agree in the future. Under Texas law, an agreement to make a contract in the future must be definite and certain upon all subjects to be embraced in the future agreement. *Bank of El Paso v. T.O. Stanley Boot Co., Inc.,* 809 S.W.2d 279, 285 (Tex.App.—El Paso 1991, writ granted, aff'm in part, rev'd and rendered in part, 847 S.W.2d 218 (Tex.1993)). The agreement fails to form a contract "[w]here any *essential* term of a contract is open for future negotiations there is no binding contract." *Id.* (cit-

ing *Gerdes v. Mustang Exploration Co.*, 666 S.W.2d 640, 644 (Tex.App.—Corpus Christi 1984, no writ) (emphasis original)).

Plaintiffs present two contentions. First, plaintiffs assert that this contract does not fall under section 8.319 as a sale of securities. Plaintiffs maintain that this contract is similar to a contract between a broker and a customer for the purchase of stock. *See Hutton v. Zaferson*, 509 S.W.2d 950, 952 (Tex.Civ.App.—San Antonio 1974, writ ref'd n.r.e.). However, *Hutton* requires that the broker act as an agent in order to bypass the requirements of the statute of frauds. *Id.* In the present case, Underwood would have sold the bonds directly to the customers and would not have acted as an agent for the purchase of a specific stock or bond. Therefore, *Hutton* does not apply.

█ Next, plaintiffs contend that the Colip letter served as a contract for purposes of the statute of frauds. However, none of the specific terms of the bond issuance or subsequent sale had been determined. None of the contractual price terms had been agreed upon. The proposed contract contained numerous blank terms that the parties had not specified. Evidence showed that many essential terms of the future agreement were still open for negotiation. For these reasons no binding contract existed.

This court finds that no valid contract existed between Ventana and Underwood and, for the reasons stated above, this court grants defendants' motion for summary judgment on plaintiffs' breach of contract claim.

### 5. Estoppel

█ Plaintiffs also contend that the doctrine of estoppel applies to this case. Under Texas law, estoppel may be invoked when a promise has been made to sign a written contract that had been prepared and that would satisfy the requirements of the Statute of Frauds. *Nagle v. Nagle*, 633 S.W.2d 796, 800 (Tex.1982); *and see Beta Drilling, Inc. v. Durkee*, 821 S.W.2d 739, 741 (Tex.App.—Houston [14th Dist.] 1992, writ denied). A promise to prepare a written contract is not sufficient. *Beta Drilling*, 821 S.W.2d at 741.

The Fifth Circuit, applying Texas law, held that:

... the defendant should ordinarily not be promissorily estopped from asserting a section 8.319 statute of frauds defense unless there is proof that he at least expressly promised to sign documents that had already been prepared or whose wording had been agreed on and that satisfy the requirements of section 8.319.

*Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 769–70 (5th Cir.1988).

For example, in *Beta Drilling*, plaintiff sued defendant for an alleged breach of an oral agreement. *Beta Drilling*, 821 S.W.2d at 739. The agreement allegedly provided that defendant would give plaintiff twenty-five percent interest in a new company and appoint plaintiff as the chief executive officer and president. *Id.* at 740. The agreement constituted an agreement for the sale of securities under section 8.319. An oral agreement for the sale of securities must satisfy certain writing requirements. Tex.Bus. & Com.Code § 8.319. The court found that estoppel did not apply because "there must have been a promise to sign a written contract which had been prepared and which would satisfy the requirements of the statute of frauds." *Id.* at 741. Consequently, the court reversed the jury's finding for plaintiff because the oral agreement failed to satisfy the Statute of Frauds. *Id.* at 742.

█ Similarly, Ventana and Underwood orally agreed that Underwood would perform underwriting services for the Arkansas bond issuance. This type of agreement also falls under section 8.319 as an agreement for the sale of securities. At the time the promise was made, no contract had been prepared that could satisfy the Statute of Frauds. No written agreement existed at the time the promise was made to perform underwriting services. As such, *Beta Drilling* requires that this court find that estoppel does not apply because no valid contract existed between Ventana and Underwood at the time the promise was made. No evidence exists that documents had been prepared in sufficient detail to satisfy the Statute of Frauds. Consequently, promissory estoppel does not apply.

### 6. Breach of Duty

■ Plaintiffs rely on *Crim Truck & Tractor v. Navistar Intern.*, 823 S.W.2d 591 (Tex.1992), for the proposition that a special or fiduciary relationship existed between Ventana and Underwood. Plaintiffs contend that Underwood owed a duty of reasonable care to avoid injury or harm to Ventana. However, "[t]he fact that one businessman trusts another, and relies upon his promise to perform a contract, does not rise to a confidential relationship." *Id.* at 594 (citing *Consolidated Gas & Equip. Co. v. Thompson*, 405 S.W.2d 333, 336 (Tex.1966)). Further, the Texas Supreme Court holds that a general duty of good faith and fair dealing does not exist in all contracts. *English v. Fischer*, 660 S.W.2d 521, 522 (Tex.1983).

■ Ordinarily, the existence of a special or confidential relationship is a question of fact. *Id.* at 594. However, the existence of evidence that forms a special or fiduciary relationship is a question of law. *Crim Truck*, 823 S.W.2d at 594; *see also Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex.1962). The mere fact that an oral agreement allegedly existed in not sufficient to form a special relationship. The Texas Supreme Court explained that every contract includes elements of trust that both parties will perform certain obligations under their agreement. *Crim Truck*, 823 S.W.2d at 595.

■ In the present case, no evidence exists that shows that the relationship between Ventana and Underwood rose to the level of a special or fiduciary relationship. This proposed contractual relationship was simply a business relationship. As noted above, Texas law does not recognize a special or fiduciary relationship based on the reliance of one party on another party to perform a contract. *See Crim Truck*, 823 S.W.2d at 594. This court finds that no special or fiduciary relationship existed between the parties. As such, this court grants defendants' motion for summary judgment on plaintiffs claims for breach of duty.

### 7. Fraud and DTPA Claims

■ As a general rule, the failure to perform the terms of a contract is a breach of contract not a tort. *Crim Truck*, 823 S.W.2d at 597. However, "when one party enters into a contract with no intention of performing, that misrepresentation may give rise to an action in fraud." *Id.* Fraud is recognized as distinct from other tort actions because it developed from quasi-contractual actions. *Matthews v. AmWest Sav. Ass'n*, 825 S.W.2d 552, 554 (Tex.App.—Beaumont, 1992). To establish common law fraud, plaintiffs must show (1) that a material misrepresentation was made; (2) that it was false; (3) that the speaker knew it was false at the time it was made or was made with a reckless disregard for the truth; (4) that the speaker made the assertion with the intention that it would be acted on by a party; (5) that the party relied on the statement; and (6) the party suffered injury due to that reliance. *Id.* (citing *Trenholm v. Ratcliff*, 646 S.W.2d 927 (Tex.1983)).

■ Plaintiffs allege that Underwood misrepresented that it was willing and able to perform underwriting services for the issuance of ADFA bonds. Plaintiffs claim that they relied on these misrepresentations in executing a $700,000 promissory note and obtaining ADFA approval of the bond issuance.

Before a promise to do something in the future can be actionable fraud, the plaintiff must plead and prove that the promise was made with a present intent not to perform. *New Process Steel Corp. v. Steel Corp. of Texas*, 703 S.W.2d 209, 214 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.). Additionally, the existence of fraudulent intent is difficult to prove. The mere breach of an agreement is not enough to establish fraudulent intent. *Id.* There must exist some evidence that calls into question defendant's present intent to perform.

In the present case, no genuine issues of material fact exist that preclude this court's grant of summary judgment on plaintiffs fraud claims. No evidence other than a present intent to perform the Arkansas transaction was exhibited. No available evidence demonstrates that Underwood did not intend to perform underwriting services for the Arkansas deal. Underwood successfully underwrote the Iowa transaction and planned on

completing the Arkansas transaction. In fact, Underwood had personnel who wanted to complete the transaction so much that they would have left the company to do so. It was only after Underwood changed management that questions arose whether Underwood would participate in the deal. The new CEO, Sorenson, evaluated the company's business deals and determined that the Arkansas deal was too risky. Simply changing one's mind about the completion of a contract, i.e. breaching a contract, does not rise to the level of actionable fraud. *See New Process Steel Corp.,* 703 S.W.2d at 214.

■■■ Furthermore, the Texas Supreme Court specifically held that claims for breach of contract, that are barred due to the application of the Statute of Frauds, may not be resurrected under other claims. *Nagle,* 633 S.W.2d at 801. In *Nagle,* the Court reversed a jury's finding that defendant fraudulently induced plaintiff to sign a contract when the contract itself was found to be unenforceable due to the Statute of Frauds. *Id.* The Court stated that if the jury's findings were allowed to stand, the Statute of Frauds would be rendered meaningless. *Id.*

■■■ For the same reasons, this court finds that Ventana's fraud claims are without merit. Without a valid contract to contest, plaintiff may not bring connected fraud claims to an unenforceable contract. Similarly, the defendants are entitled to summary judgment on plaintiffs' DTPA claims. When the only damages or loss to a plaintiff is limited to the subject matter of the contract, the plaintiff's action rests only on the contract. *Southwestern Bell Tel. Co. v. Delanney,* 809 S.W.2d 493, 494 (Tex.1991). In *Delanney,* the Texas Supreme Court reversed the lower court's determination that a negligence claim was properly brought by a plaintiff claiming that Southwestern Bell negligently canceled its Yellow Pages advertisement. *Id.* The Court held that:

> The acts of a party may breach duties in tort or contract alone or simultaneously in both. The nature of the injury most often determines which duty or duties are breached. When the injury is only the economic loss to the subject of a contract itself the action sounds in contract alone.

*Id.* at 495 (quoting *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex.1986)).

■■■ In the present case, plaintiffs' alleged injury is the economic loss of benefits derived from the alleged contract. Since this claim is based in contract alone and the contract is unenforceable due to the Statute of Frauds, no valid DTPA claims exist. To establish a DTPA claim under Texas law plaintiffs must show that: (1) a material misrepresentation, (2) that was false, (3) and was known to be false at the time it was made or was made in a reckless disregard for the truth, (4) that was intended to be acted upon, (5) was relied upon, and (6) caused injury. *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 688 (Tex.1990), *cert. denied,* 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991). These criteria are essentially the same as the criteria for common law fraud. *See Matthews,* 825 S.W.2d at 554. Absolutely no evidence exists that raises a fact issue of whether Underwood knew that it would withdraw from this transaction at the time the proposed agreement was entered. Consequently, summary judgment is appropriate based on the deficiency of genuine fact issues as well as the Texas Supreme Court holdings in *Nagle* and *Delanney.*

### 8. *Conclusion*

Plaintiffs attempt to bring a cause of action arising from an alleged breach of contract claim. The statute of frauds bars any claims relating to this alleged breach of contract because any damages that resulted are directly related to the alleged breach. As such, Texas law does not permit alternative claims to arise if an action based on an alleged breach of contract is denied due to the statute of frauds. This case presents no genuine issues of material fact on the issue of whether the statute of frauds bars this claim in all respects.

For these reasons and the reasons stated above, this court finds that the defendants' Motion for Summary Judgment on the merits should be GRANTED. The plaintiffs' Motion for Summary Judgment lacks merit and is DENIED. This court also GRANTS defendants' Summary Judgment Motion on

its counterclaim for enforcement and payment of the notes due and owing.