NEW PROCESS STEEL
CORPORATION, INC.,
et al., Appellants,

v.

STEEL CORPORATION OF TEXAS,
INC., Appellee.

No. 01–84–0149–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Oct. 24, 1985.

Rehearing Denied Jan. 9, 1986.

See also, 638 S.W.2d 522.

Thomas J. Sims, Lee M. Larkin, Fouts & Moore, Sheldon E. Richie, Susan Steinfink Soussan, Jane Cooper-Hill, Richie & Greenberg, Houston, for appellants.

William Key Wilde and Mark E. Lowes, Bracewell & Patterson, Houston, John Athens, Conners & Winters, Tulsa, Okl., of counsel, for appellee.

Before EVANS, C.J., and HOYT and HUGHES (Retired), JJ.

## OPINION

HUGHES, Justice (Retired).

New Process Steel Corporation, E.R. Fant, Inc., and S & S Alloys, Inc. brought this action against Steel Corporation of Texas (SCOT), alleging breach of contract and fraud. SCOT answered and filed counterclaims, asserting interference with its security interests, civil conspiracy, and a claim for debt. A jury answered issues on the contract and fraud actions in favor of New Process Steel, Fant, and S & S Alloys, awarding damages on those issues in excess of $1,200,000, plus $4,000,000 exemplary damages.

The trial court granted SCOT's motion to disregard all findings of the jury on damages, including the jury's answer of "zero" on SCOT's damages issue, and rendered a judgment non obstante verdicto. The judgment awarded no damages to New Process Steel, Fant, and S & S Alloys on their claims against SCOT, rescinded the agreement in question, and adjudged $323,292 attorney's fees against SCOT with provision for increased amounts in the event of appeals. The court's judgment also awarded SCOT the sum of $1,242,318 on its counterclaim against S & S Alloys and $171,000 as attorney's fees on that claim.

We affirm in part, reverse and render in part, and reverse and remand in part.

In 1977, S & S Alloys owed SCOT an unsecured debt of approximately $500,000, but because of S & S Alloys' financial condition, it was questionable whether the debt would ever be paid. After the secured creditors of S & S Alloys threatened to foreclose on their debts, SCOT decided to buy out their interests and to obtain better management for S & S Alloys so that it could become a profitable business.

For this purpose, SCOT's board of directors authorized its president, Robert C. Kiefer, to negotiate with New Process Steel about taking over the management of S & S Alloys. In April 1978, SCOT's board of directors, by corporate resolution, delegated authority to Kiefer to "negotiate a repayment schedule" with S & S Alloys, subject to the approval of the board's executive committee. As a result of negotiations between Kiefer and E.R. Fant, who was the majority shareholder of New Process Steel and of E.R. Fant, Inc., a management agreement was reached in May 1978. New Process Steel agreed to provide management, inventory, and working capital to S & S Alloys while determining if it was interested in purchasing S & S Alloys. SCOT, through Kiefer, agreed (1) that it would not try to collect its debt from S & S Alloys during the term of the management agreement and (2) that as the sole secured creditor of S & S Alloys, it would place an upper limit on its security interest in an amount equal to the dollar value of that security interest at the time New Process Steel began its management of S & S Alloys.

During this management period, New Process Steel made numerous sales and cash advances to S & S Alloys, while Kiefer and E.R. Fant continued to negotiate regarding the purchase of S & S Alloys. A major topic of conversation was SCOT's release of its security interest in S & S Alloys. Fant considered the release essential to S & S Alloys' being able to obtain additional credit and becoming a profitable entity. Kiefer kept SCOT's executive board abreast of these negotiations.

Kiefer and Fant succeeded in their efforts to reach an agreement, and a closing date was set for January 16, 1979. Shortly before that date, Kiefer spoke with a majority of SCOT's executive committee and received their individual approvals of the

proposed agreement. At the closing, E.R. Fant, Inc., purchased S & S Alloys on the understanding that SCOT would accept a new note guaranteed by E.R. Fant, Inc. in exchange for (1) the $1,000,000 promissory note that SCOT held against S & S Alloys and (2) the outstanding accounts receivable due to SCOT from S & S Alloys. According to Fant, the new note was to be drawn up after the correct dollar amount for the transaction had been calculated.

After the closing, SCOT's management began to have second thoughts about the advisability of the transaction. SCOT fired Kiefer in June 1979, and then advised Fant that, to the extent any agreement had been made on January 16, SCOT was not willing to perform. New Process Steel, E.R. Fant, Inc., and S & S Alloys brought this suit against SCOT on August 16, 1979. On September 1, 1979, inventory that had been shipped to S & S Alloys during the management agreement period and after the January 16 purchase of S & S Alloys, and for which no payment had been made, was transferred back to New Process Steel by a bookkeeping transaction. Also transferred to New Process Steel were S & S Alloys' accounts receivable. New Process Steel's evidence showed that assets sufficient to satisfy SCOT's security interest were left with S & S Alloys.

The trial to the jury lasted some 11 weeks, and the 34 volume statement of facts contains 8,245 pages. The trial court submitted 26 special issues to the jury. In response to these issues, the jury found:

(Special Issue No. 1) That Kiefer, as president of SCOT; E.R. Fant, acting on his own behalf as well as for New Process Steel; S & S Alloys; and E.R. Fant, Inc., made an agreement on or about January 16, 1979, whereby: Fant would purchase the stock of S & S Alloys; Fant would personally guarantee or endorse SCOT's note from S & S Alloys for over $1,400,000, representing all of S & S Alloys' debts to SCOT; S & S Alloys would pay SCOT about $99,000 upon SCOT's release of its lien; SCOT would cancel its $1,000,000 note; SCOT would waive any accounts receivable owing from S & S Alloys; and SCOT would release its lien on all assets;

(Special Issue No. 2) That the majority of SCOT's executive committee approved this agreement;

(Special Issue No. 3) That Kiefer had express authority to make the agreement;

(Special Issue No. 4) That Kiefer had apparent authority to make the agreement;

(Special Issue No. 5) That SCOT was estopped to deny the agreement;

(Special Issue No. 6) That SCOT ratified the agreement; and

(Special Issue No. 7) That New Process Steel and E.R. Fant, Inc., knew or should have known on September 26, 1979, that SCOT would not perform the agreement.

In response to the damage issue in the contract action, the jury found:

(Special Issue No. 8) That the sum of $616,737 would restore to New Process Steel and E.R. Fant, Inc., the value and funds of materials supplied to S & S Alloys, Inc., pursuant to the agreement with SCOT.

In response to the issues submitted on the fraud theory, the jury found:

(Special Issue No. 9) That on or about January 16, 1979, SCOT fraudulently failed to inform New Process Steel that SCOT did not intend to perform the agreement; and

(Special Issue No. 10) That the sum of $660,590 would reasonably compensate New Process Steel for damages caused by SCOT's fraudulent failure to inform New Process Steel that it did not intend to perform the agreement.

In response to an additional damage issue, the jury awarded:

(Special Issue No. 11) $4,000,000 to New Process Steel as exemplary damages.

In response to SCOT's issues, the jury:

(Special Issue No. 12) Failed to find that S & S Alloys owed any money to SCOT;

(Special Issue No. 13) Failed to find that E.R. Fant individually, E.R. Fant, Inc., or

New Process Steel had effected the transfer of inventory, accounts receivable, and equipment from S & S Alloys to New Process Steel in September 1979, with the intent to delay or hinder SCOT or to defraud SCOT;

(Special Issue No. 14) Failed to find that such transfer was not accompanied by immediate delivery and was not followed by actual and continued change of possession, or that such transfer prejudiced SCOT's rights in such items;

(Special Issue No. 15) Failed to find that such transfer was a major part of the materials, supplies, and inventory of S & S Alloys;

(Special Issue No. 16) Found that such transfer was in the ordinary course of S & S Alloys' business;

(Special Issue No. 17) Failed to find that such items had any value on the date of transfer;

(Special Issue No. 18) Failed to find that E.R. Fant, individually, E.R. Fant, Inc., or New Process Steel intentionally and improperly interfered with the performance by S & S Alloys of its payment and debt obligations to SCOT;

(Special Issue No. 19) Found $0 damages were due to SCOT.

In response to Special Issue Nos. 20–23, the jury failed to find any civil conspiracy between Kiefer, Fant, E.R. Fant, Inc., or New Process Steel, or that any damages resulted therefrom, and it refused to award exemplary damages to SCOT. In response to the remaining issues, the jury found:

(Special Issue No. 24) That SCOT represented to Kiefer that he had authority to enter into the agreement on January 16, 1979;

(Special Issue No. 25) That Kiefer relied on such representations; and

(Special Issue No. 26) That a reasonably prudent person, in the same or similar circumstances as Kiefer, would, by reason of the normal custom and practice of doing business at SCOT, reasonably have believed that he had authority to enter into the agreement.

We first consider New Process Steel's points of error two, three, and four, challenging the trial court's refusal to give effect to the jury findings on Special Issue No. 10, the damages issue submitted on the fraud theory, and Special Issue No. 11, the exemplary damages issue.

■■■ A court may disregard the jury's finding to a special issue only if the finding has no support in the evidence or it is rendered immaterial by other findings. *C. & R. Transport, Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex.1966); Tex.R.Civ.P. 301. In considering whether there is legally sufficient evidence to support the finding, we may consider only that evidence that supports the finding, and we must view the record in the light most favorable to the jury's verdict. *Williams v. Bennett*, 610 S.W.2d 144 (Tex.1980).

Special Issue 10 was conditioned upon the jury's affirmative finding to Special Issue No. 1, which inquired whether an agreement had been reached between SCOT's president, Kiefer, and New Process Steel. SCOT challenges the submission of Special Issue No. 1, contending in its cross-points (labelled counter-points) 19, 20, and 21, that (a) the issue was a material variance from the plaintiff's pleadings, (b) it was not a controlling issue upon which the essential elements of an agreement could be founded, and (c) there was no evidence that the agreement was ever submitted to SCOT for its approval.

We find that all essential elements of an agreement are either set forth in Special Issue No. 1 or are established by the undisputed evidence. We perceive no material variance between the terms of the agreement as alleged and those set forth in the special issues. We hold that the evidence is legally and factually sufficient to support the jury's finding on Special Issue No. 1.

■■■ A recovery based on fraud requires proof that: (1) a material representation was made, (2) the representation was false, (3) the speaker knew the statement was false when made or was reckless about

the truth of the matter asserted, (4) the statement was made with the intent that it should be acted upon by the other party, and (5) the other party acted in reliance upon it and thereby suffered injury. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983). If the alleged fraudulent statement was a promise to take future action, there must also be proof that the promise was made with a present intent not to perform. *K.W.S. Manufacturing Co. v. McMahon*, 565 S.W.2d 368, 371 (Tex.Civ.App.—Waco 1978, writ ref'd n.r.e.); *Acoustical Screens in Color, Inc. v. T.C. Lordon Co.*, 524 S.W.2d 346, 349 (Tex.Civ.App.—Dallas 1975, writ ref'd n.r.e.).

An agreement to take some future action, made with the intent that the obligation will not be performed, in order to deceive another person, is actionable fraud. *Stanfield v. O'Boyle*, 462 S.W.2d 270, 272 (Tex.1971); *Stone v. Williams*, 358 S.W.2d 151 (Tex.Civ.App.—Houston 1962, writ ref'd n.r.e.). The existence of fraudulent intent is difficult to prove, and mere breach of the agreement is not enough in itself to establish such intent. But when a party denies making the agreement, that fact, together with the party's failure to perform, is evidence from which the lack of present intent to perform may be inferred. *Stanfield v. O'Boyle*, 462 S.W.2d at 272; *Southwestern Bell Telephone Co. v. Meader Construction Co.*, 574 S.W.2d 839, 843 (Tex.Civ.App.—El Paso 1978, writ ref'd n.r.e.).

The trial court instructed the jury as follows:

> You are instructed that, in order to be fraud or fraudulent, you must find (1) that Steel Corporation of Texas made a material misrepresentation, (2) that the representation was false, (3) that Steel Corporation of Texas knew it to be false at the time it was made, (4) that it was made with the intent, (5) that it would be acted upon, (6) that New Process Steel Corporation reasonably relied on it, and (7) that New Process Steel Corporation suffered injury as a result of that reliance.

A "misrepresentation" may consist of the concealment of a material fact when there is a duty to speak. The duty to speak or to disclose arises when one party knows that the other party is relying on the councealed [sic] fact, provided that he knows the relying party is ignorant of the facts and does not have an equal opportunity to discover the truth.

The court's charge adequately instructed the jury on the essential elements of fraud, and its definition sufficiently apprised the jury that in order to answer the issue affirmatively, it was required to find that SCOT did not intend to perform when the agreement was made.

We find that there is evidence from which the jury could reasonably have concluded that SCOT acted to defraud the appellants. It is undisputed that Kiefer kept the executive committee of SCOT fully advised of his negotiations with Fant. Kiefer gave the officers and directors of SCOT an outline of the proposed transaction, including the plan that SCOT release its security interest. On January 10, 1979, when Kiefer met with board chairman Russell S. Davis, Jr., and another member of the executive committee, he was told "to proceed with the deal." Davis told Kiefer that the board would "back him," and Kiefer then confirmed the committee's approval by canvassing them individually. He received a definite commitment from a majority of the committee members.

On January 17, 1979, the day after the closing, Davis wrote a memo referring to the transaction as "approved by the majority of the executive committee of the board." A month later, on February 15, Kiefer clarified the agreement for Davis, indicating that an essential item in the agreement was SCOT's relinquishment of its security interest in return for Fant's guarantee of the debt. Finally, Davis told Kiefer to reduce to writing the agreement "that you have made," for the benefit of SCOT's audit committee. Kiefer himself testified that the authority to transact had been delegated to him, that he complied with the board's resolution in negotiating

the transaction, and that he had approval of the members of the executive committee.

Despite this evidence of the board's ongoing involvement in, and approval of, the agreement negotiated with Fant, board chairman Davis denied that either he or SCOT's board had ever approved the agreement. Indeed, his testimony was that the agreement had been approved only "in concept." The jury was not required to accept Davis' explanation, and it was entitled to decide from all the circumstances in evidence whether SCOT's agreement was made with no intent to perform.

■ Where a contract is breached through the fraud of one of the parties, the measure of damages is the amount required to compensate the other party for his loss of the benefit of the bargain. *See Ryan Mortgage Investors v. Fleming-Wood,* 650 S.W.2d 928, 936 (Tex.App.—Fort Worth 1983, writ ref'd n.r.e.). In addition, the injured party is entitled to recover for collateral losses occasioned by his reliance upon the other party's fraudulent representations. *See Wright v. Carpenter,* 579 S.W.2d 575, 578 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.); *El Paso Development Co. v. Ravel,* 339 S.W.2d 360 (Tex.Civ.App.—El Paso 1960, writ ref'd n.r. e.).

■ There is legally and factually sufficient evidence to support the jury's finding on damages. The jury was presented with evidence that sales from S & S Alloys to New Process Steel during the period of January 16, 1979, through September 1, 1979, totalled $523,505.75. There was also evidence that cash advances during that period totalled $112,022 and that payments to third-party vendors totalled $25,062.62. The grand total of these sums is $660,-590.57, slightly more than the amount of damages found by the jury in response to Special Issue No. 10.

SCOT argues that the jury failed to take certain factors into consideration that would completely offset these amounts. By repossessing items in S & S Alloy's inventory, New Process mitigated the damages occasioned by SCOT's fraud, even though it was not obligated to do so. *See Meadolake Foods, Inc. v. Estes,* 218 S.W.2d 862, 868 (Tex.Civ.App.—El Paso 1948), *writ ref'd n.r.e. per curiam,* 148 Tex. 13, 219 S.W.2d 441 (1949). However, it was SCOT's burden to prove the extent to which damages were mitigated, *id.* 219 S.W.2d at 441, and its proof did not establish the amount of the claimed mitigation as a matter of law. The jury was therefore not required to accept SCOT's argument that the repossessed items extinguished New Process Steel's damages.

We hold that the jury's findings on damages, in response to Special Issue No. 10, were within the range of the credible testimony. We accordingly sustain the second point of error and hold that the trial court erred in disregarding the jury's finding to Special Issue No. 10. We overrule SCOT's cross-points 45 through 51, which complain of the court's definition of fraud and which challenge the legal and factual sufficiency of the evidence to support the jury's finding on Special Issue No. 9.

■ We also sustain the third point of error and hold that the trial court erred in disregarding Special Issue No. 11, which awarded exemplary damages to New Process Steel. The trial court's award is supported by the jury's finding on Special Issue No. 9, the fraud issue, and on Special Issue No. 10, the damages issue. *Trenholm v. Ratcliff,* 646 S.W.2d at 933. That the court also afforded the equitable remedy of rescission does not preclude the right to the award of exemplary damages. *See Nabours v. Longview Savings & Loan Association,* 700 S.W.2d 901, 903–05 (1985); *Nolan v. Bettis,* 577 S.W.2d 551, 555 (Tex. Civ.App.—Austin 1979, writ ref'd n.r.e.); *Tashnek v. Hefner,* 282 S.W.2d 298, 303 (Tex.Civ.App.—Galveston 1955, writ ref'd n.r.e.).

Appellants correctly argue that they are entitled to judgment on the legal theory that affords them the greatest relief. *See, Mowery v. Fantastic Homes, Inc.,* 568 S.W.2d 171 (Tex.Civ.App.—Dallas 1978, no

writ). They are not entitled to a double recovery. *Jones v. Rainey,* 168 S.W.2d 507 (Tex.Civ.App.—Texarkana 1942, writ ref'd). Because the rescission theory is predicated upon the existence of a contract, *see Gehl Brothers Manufacturing Co. v. Price's Producers, Inc.,* 319 S.W.2d 955, 958 (Tex. Civ.App.—El Paso, 1958 no writ), and because exemplary damages are not recoverable in an action based solely on a contract, *see A.L. Carter Lumber Co. v. Saide,* 140 Tex. 523, 168 S.W.2d 629 (1943), the appellants' greatest relief is afforded by their fraud complaint. We sustain the fourth point of error. This obviates the necessity of addressing any issues pertaining solely to appellants' contract theory.

Appellants' sixth point of error contends that the trial court erred in granting SCOT's motion to disregard the jury finding of zero dollars due SCOT on its counterclaims, and in entering judgment against S & S Alloys in the amount of $1,241,318.

 A trial court may not properly disregard a jury's negative finding and substitute its own affirmative finding unless the evidence conclusively establishes the issue. *Payne v. Snyder,* 661 S.W.2d 134, 144 (Tex.App.—Amarillo 1983, writ ref'd n.r.e.); *Brownsville & Matamoros Bridge Co. v. Null,* 578 S.W.2d 774, 780 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.). In determining whether the evidence establishes an issue as a matter of law, we must review all evidence in a light most favorable to the jury's finding and disregard all evidence and inferences to the contrary. *Trenholm v. Ratcliff,* 646 S.W.2d at 931; *Dodd v. Texas Farm Products Co.,* 576 S.W.2d 812 (Tex.1979). It is for the jury to resolve any conflicts in the evidence, and even if the evidence is not conflicting, but reasonable minds might differ as to its effect, a fact issue is presented. *LeMaster v. Fort Worth Transit Co.,* 138 Tex. 512, 160 S.W.2d 224 (1942).

SCOT filed counterclaims alleging that S & S Alloys was indebted to SCOT by a promissory note in the amount of $1,000,-000, providing for the accrual of interest both before and after default. SCOT claimed recovery for both basic interest and for an interest penalty. SCOT further claimed a recovery for cash advances made to S & S Alloys. The trial court's docket entry, made upon granting the judgment n.o.v., recites in pertinent part:

Defendant's Motion to Disregard Jury Finding to Special Issues is granted as to Special Issue No. 12. The Court concludes as a matter of law that Defendant recover of S & S Alloys $1,241,318.00 ($1,000,000.00 promissory note plus $531,678.00 accounts receivable, less $40,000.00 proceeds from sale of real estate, less $136,000.00 for sale of trolling motors, less $114,360.00 for "cash advance.")

Applying the standards of review governing the judgment n.o.v., we find that the trial court erred in concluding, as a matter of law, that SCOT was entitled to this recovery.

 Gary Miller, SCOT's controller, acknowledged that the amounts claimed as cash advances were initially listed as "consigned inventory" on SCOT's books and later reclassified as cash advances under his direction. He admitted that the various documents evidencing the $230,000 debt, originally classified as "consigned inventory," implied that SCOT had purchased steel in some unspecified amount from S & S Alloys. Miller further admitted that he did not know whether some of the invoices included in the $230,000 debt reflected sales and shipments by S & S Alloys of inventory that SCOT had purchased and that later had been sold by S & S Alloys to others. Finally, while initially contending that SCOT never received any steel for the amounts expended, Miller admitted that some "junk steel" had been transferred from an S & S Alloys warehouse to a SCOT warehouse in January 1979, and later was given to an Oklahoma receiver. Miller concluded that even though the inventory moved to the SCOT warehouse was never entered on the SCOT books, it would be "speculation" to assume that the goods were related to the various transactions originally classified as "consigned invento-

ry" transactions. We hold that these ambiguities foreclose any conclusive assessment of SCOT's claim.

 We also hold that fact questions exist regarding whether SCOT was entitled to interest on the note, in view of Fant's testifying that SCOT agreed to waive all interest accrued on the note after the management agreement became effective on May 1, 1978. *See Stowers v. Harper,* 376 S.W.2d 34 (Tex.Civ.App.—Tyler 1964, writ ref'd n.r.e.). The jury had the exclusive power to decide the fact issues, and the trial court erred in concluding that SCOT's damages were proved as a matter of law. We sustain the sixth point of error.

SCOT also complains that the jury's finding of zero damages was against the great weight and preponderance of the evidence. After reviewing the entire record, as required on a factual insufficiency point, we hold that SCOT is correct in this assertion. The evidence supporting the existence of the debt, based on the promissory note and accounts receivable, was overwhelming. The appellants have never challenged the existence of the note. We sustain SCOT's reply point twelve, sever the issues asserted in SCOT's counterclaim, and remand those issues for a new trial. *Maxey v. Texas Commerce Bank of Lubbock,* 571 S.W.2d 39, 47–48 (Tex.Civ. App.—Amarillo 1978), *writ ref'd n.r.e. per curiam,* 580 S.W.2d 340 (Tex.1979). We also hold that the trial court did not err in refusing to enter judgment on SCOT's other counterclaims, and we overrule cross-points 68–75.

We reverse the trial court's take-nothing judgment against the appellants on their claim based on fraud, and we render judgment on the jury's verdict that the appellants recover from SCOT the sum of $660,-990, plus exemplary damages in the amount of $4,000,000. We also reverse that portion of the judgment awarding SCOT a recovery on its counterclaim against S & S Alloys, sever that action from the main cause, and remand the severed cause, including SCOT's request for attorney's fees, to the trial court for a new trial.

In all other respects, the judgment is affirmed.