**TEXAS WESTHEIMER CORPORATION,**
Appellant,

v.

**5647 WESTHEIMER ASSOCIATES,
a Texas General Partnership,**
Appellee.

**No. 01–99–00172–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

Jan. 31, 2001.

Publication Ordered May 14, 2001.

Michael Phillips, Evelyn Ailts Derrington, Phillips & Akers, P.C., Houston, for Appellant.

R. Chris Bell, Alice Oliver–Parrott, Maria Teresa Arguindegui, Burrow & Parrott, L.L.P., Houston, for Appellee.

Panel consists of Justices MIRABAL, WILSON, and NUCHIA.

## OPINION

MIRABAL, Justice.

Defendant, Texas Westheimer Corporation (TWC), appeals the judgment rendered on a jury verdict finding defendant breached its contract with, and committed fraud against plaintiff, 5647 Westheimer Associates (the partnership), and assessing actual damages and exemplary damages against defendant. We affirm.

## BACKGROUND

Sam Siam, who had some experience in the nightclub business, Robert Mousa, and Saman Khalaf decided to open a nightclub at 5647 Westheimer, the former location of Cutter Bill's, a western wear store. Siam, Mousa, and Khalaf each formed a corporation, and the three corporations became the partners in 5647 Westheimer Associates, a Texas general partnership. The partnership obtained a lease on the building at 5647 Westheimer, and each partner contributed $200,000 to renovate the building to make it suitable for a nightclub. In late 1989, they opened the club, Humphrey's, which was intended to attract a mature clientele with music from the 1950s and 1960s, entertainment, dining, and dancing. The opening was not successful, and the club operated at a loss for several months. The partners changed the name and format of the club in an attempt to increase its business, and each partner contributed at least an additional $100,000 to the business, but the club continued to lose money.

In March 1990, Siam was approached by Thomas Woodall, an attorney, on behalf of David Fairchild and Texas Richmond Corporation, to discuss operating a sexually oriented business at 5647 Westheimer.

Fairchild had been involved in managing sexually oriented businesses since 1979 or 1980 and was a shareholder in Texas Richmond Corporation, which operated The Men's Club in Houston.

On May 14, 1990, Fairchild, on behalf of the newly-formed Texas Westheimer Corporation (TWC), and Mousa, on behalf of the partnership, executed an agreement of sale and a profit participation agreement. The agreement of sale provided that the partnership would sell, and TWC would purchase, all the assets of the partnership. According to this agreement, TWC would assume the lease on 5647 Westheimer and would expend up to $75,000 to discharge the partnership's debts, which totaled $114,947.

The profit participation agreement, executed as partial consideration for the sale of the assets, provided that costs incurred in design, construction, and opening the new business would be considered capital expenditures and would not be charged against the profits and losses of the club; and costs of advertising, payroll, liquor and food inventory, uniforms, and other equipment would be considered costs of operation in determining profits and losses. The partnership liabilities discharged by TWC, specifically referenced in the agreement of sale, would be charged against the partnership's share of the profits. The accounting was to be in accordance with generally accepted accounting principles. TWC was to keep records of expenses and revenues and, based upon the records, would provide a full monthly accounting of profits and losses for the business. Payments of profit distributions were to be made at the time the monthly accounting was delivered. Based on this monthly accounting, TWC would render, for the benefit of the partnership, to two appointed trustees "that portion of the profits and losses of the business operation" as fol-

lows: 30 percent until the partnership had received $500,000, 20 percent until the partnership had received an additional $250,000, and 10 percent "thereafter but not to exceed six years from the effective date hereof." The agreement provided that it would "terminate on its anniversary date, six (6) years following the effective date hereof, after which time the [partnership] will have no further entitlements whatsoever."

Two trustees were appointed in the agreement: Woodall by TWC and Mousa by the partnership. These trustees were charged with receiving and reviewing the accounting, questioning errors or discrepancies, reviewing TWC's books and records, investigating complaints regarding the accounting or allocations, and distributing profits and proceeds, if any, to the partnership. Any objections to the monthly accounting were to be referred to the trustees within 30 days for investigation and resolution. The trustees were to be paid for their services, Woodall at $150 per hour and Mousa at $2,500 per month.

Because the owner of the property at 5647 Westheimer refused to approve a sublease, TWC negotiated a new lease at a higher monthly rent with the owner. An addendum to the agreement of sale was executed by TWC and the partnership. This addendum recognized the termination of the partnership's obligation and rights under the original lease and provided that the additional rent would be deducted from the money due the partnership under the profit participation agreement.

On May 25, 1990, the Internal Revenue Service executed a search warrant on Fairchild's office and seized documents and records. Fairchild and others involved with Texas Richmond Corporation were indicted for conspiracy to defraud the United States by skimming cash from two nightclubs in San Antonio and a topless

club in Houston, tax evasion, and illegally structuring financial transactions from December 1980 through August 16, 1990. In December 1993, Fairchild entered into a plea agreement with the federal prosecutor in which Fairchild would plead guilty to one count of conspiracy to defraud the United States by participating in cash skimming. There was no allegation of cash skimming relating to the club at 5647 Westheimer, and the actions for which Fairchild was prosecuted were concluded before that club was opened.

The topless club, called Cutter Bill's, opened at 5647 Westheimer in October 1990. In January 1991, the club's name was changed to Baby'O. Fairchild set up a separate corporation, TRC Management Consultants, Inc., to pay management salaries because the managers worked for both Baby'O and The Men's Club. TWC sent monthly accountings to the partnership. These accountings indicated that, although some months in 1991 showed a profit, overall, the club was operating at a loss.

The partnership raised questions about the profit and loss statements at least as early as January 1991. On February 6, 1991, Woodall wrote the following to Fairchild:

> In our meeting with you in January we went over the P & L Analysis for Texas Westheimer Corporation for July through October 31, 1990; November 1, 1990 through November 30, 1990; and December 1, 1990 through December 31, 1990 and you answered many of our questions. Present at the meeting were the undersigned and Saman Khalif [sic], Paul Hanna, and Sam Siam. At that time you agreed to provide us with additional information such as the month to date paid items by account.
>
> Since the meeting other questions have arisen.
>
> . . . .

> Please furnish the undersigned the month to date paid items by account, general ledger, accounts receivables, and accounts payable for the periods set out above. When the January 1991 P & L is prepared we would like the above items and accounts for January also. We will be glad to pick them up at your convenience.
>
> Further, Bob Moussa [sic] has arranged with his accountant, Richard Hopkins (C.P.A.), to have him personally review the books and records. Please advise when this may be done . . . .
>
> . . . .
>
> Thank you for your cooperation in this matter. We feel certain once the records have been scrutinized by a professional he can answer all inquiries to the satisfaction of the interested parties so that they may have a better understanding of accounting methods and operations. Once this has been accomplished we do not anticipate the need for such a thorough review in the future.

In response, Fairchild, on March 12, 1991, faxed a message to Woodall that he would be out of town for the rest of the week and could have the records ready the last of the following week. He also said, "I don't see any reason for anyone to be present other that [sic] Mousa and his accountant. If any of the other partners have questions, have them make a list and we will provide the answers." Woodall replied that he, Mousa, and the accountant would review the financial documents on March 27, 1991.

On April 22, 1991, Stephen Palmerton, the accountant who reviewed the requested documents, wrote Fairchild asking some questions regarding the following items:

1. The September 30, 1990 Income Statement showed expenses totaling

approximately $65,000 that were not specifically authorized by the profit participation agreement as pre-opening expenditures to be charged to the profit and loss of the club.

There was also some concern that some pre-opening capital expenditures may have been paid after opening and have been charged to the profit and loss statement.

2. How management fees, listed as consulting services, were accumulated and charged to the operation. They wanted to see a detailed analysis of those salaries.

3. Details of the $775,600 in advances from Fairchild to the club, how they were accumulated, and what they were used for.

Fairchild responded on April 25, 1991 as follows:

1. All costs prior to the opening of the club were accounted for properly, and no expenditures for initial design and construction were claimed as expenses.

2. "We have been over this many times...." Fees charged to and paid by TWC for on-site management and certain personnel were for salaries, taxes, insurance or administrative costs for those employees. They also shared three administrative personnel with The Men's Club and paid 50 percent of those expenses. For some time, The Men's Club had paid 100 percent of the administrative personnel expenses due to TWC's lack of cash flow. There had been no advances to principals of TWC and no payments to any employees or management who did not work for Baby'O.

3. "The advances of funds by shareholders of the corporation do not effect [sic] the profit or loss of the business, therefore I decline to address this issue."

Fairchild closed by saying,

I sincerely hope the above explanations settle the questions.... Please be advised that I can no longer afford to spend the time required for itemizing explanations of these items for which we have discussed so many times. If you need any further explanation I will be forced to charge an administrative fee to Texas Westheimer Corporation and on to you through the profit and loss statements for the time involved.

Sometime before September 5, 1991, Woodall, Mousa, and Siam met. Mousa told Woodall that he had resigned as co-trustee. Mousa and Siam expressed their concerns over their agreement with TWC and about whether they were dealt with fairly and whether they would ever receive any money. Siam told Woodall they had seen several attorneys and were considering filing suit against Fairchild, Woodall, and TWC. Woodall informed Fairchild about this meeting in a letter dated September 5, 1991.

The partnership filed its lawsuit in May 1992.[1] The jury found that (1) TWC breached its agreement in its calculation of the monthly amounts due; (2) TWC committed fraud against the partnership; (3) $464,963.83 would fairly compensate the partnership for their loss; and (4) $600,000 should be assessed against TWC as exemplary damages for its fraud. The trial court rendered judgment awarding actual

1. The lawsuit named TWC, Thomas A. Woodall, Patrick V. Strong (an attorney for TWC), and David A. Fairchild as defendants. Plaintiff dismissed its claims against Woodall and Strong, and the action against Fairchild was severed and abated.

and exemplary damages, in accordance with the jury verdict.

## DISCUSSION

### I. STANDING

In its first issue, TWC contends that the partnership had no standing to pursue this litigation under section 171.252(1) of the Texas Tax Code and Articles 7.12(c) and 8.18 of the Texas Business Corporation Act. TWC asserts that Gehan Nevert, Inc., the corporation formed by Siam, and Khalaf Corporation, formed by Saman Khalaf, forfeited their right to do business on June 17, 1991, and M.A. Corporation, formed by Mousa, was never registered in Texas as a foreign or domestic corporation. It argues that, under the Texas Business Corporation Act, a foreign corporation that does not obtain a certificate of authority to do business in this state cannot maintain a lawsuit in any court of this state, and under the Texas Tax Code, a corporation whose privileges are forfeited by the Secretary of State cannot maintain a lawsuit in any court of this state. TWC then argues that, because none of the three corporate partners was permitted to maintain a lawsuit in this state, the partnership should not have a right to maintain this lawsuit.

The formation of the partnership, the sale of its assets to TWC, the actions complained of, and the filing of this lawsuit occurred before the enactment of the Revised Texas Partnership Act, which was effective January 1, 1994. *See* Tex.Rev. Civ.Stat.Ann. art. 6132b–1.01 to –11.04 (Vernon Supp.2001). The new act is not retroactive and does not apply to this case.

*See Bohatch v. Butler & Binion,* 977 S.W.2d 543, 545–46 (Tex.1998).

 A partnership is an entity legally distinct from its partners. *See Haney v. Fenley, Bate, Deaton and Porter,* 618 S.W.2d 541, 542 (Tex.1981). Under the former Texas Universal Partnership Act,[2] dissolution of a partnership was caused, among other events, by the termination of the particular undertaking specified in the partnership agreement, or by the express will of any partner or of all the partners. Upon dissolution, the partnership was not terminated, but continued until the winding up of partnership affairs was completed. Tex.Rev.Civ.Stat.Ann. art. 6132b § 30 (expired January 1, 1999); *see also Ross v. Walsh,* 629 S.W.2d 823, 825 (Tex.App.— Houston [14th Dist.] 1982, no writ). A partner may bring suit on behalf of the partnership during the winding up of the partnership's business. *See Allied Chem. Co. v. DeHaven,* 824 S.W.2d 257, 264–65 (Tex.App.—Houston [14th Dist.] 1992, no writ) (holding that resigning partner could sue a third party for recovery of proceeds from transaction intended to benefit the partnership).

 The formation of 5647 Westheimer Associates was for the sole purpose of operating a nightclub at 5647 Westheimer. In May 1990, the partnership sold all its assets, including its goodwill and name, to TWC for consideration that included an agreement that the partnership would share in the profits of a club operated at the location and TWC's agreement to partially discharge the debts of the partnership. After the sale of assets, the partnership's only purpose was to re-

---

2. Texas Uniform Partnership Act, 57th Leg., R.S., ch. 158, 1961 Gen.Laws 289, *amended by* Acts of 1979, 66th Leg., R.S., ch. 723, § 5, 1979 Tex.Gen. Laws 1782, *amended by* Acts of 1985, 69th Leg., R.S., ch. 159, § 76, 1985 Tex.Gen. Laws 713, *amended by* Acts of 1991, 72nd Leg., R.S., ch. 901, §§ 83–85, 1991 Tex. Gen.Laws 3234–35, *amended by* Acts of 1993, 73rd Leg., R.S., ch. 917, § 2, 1993 Tex.Gen. Laws 3912–13 (expired January 1, 1999).

ceive distributions according to the profit participation agreement.

Siam testified at trial that he did not believe the partnership still existed. He did not testify, and we find nothing in the record regarding when the partners decided to end the partnership. Two of the corporate partners' charters were forfeited on June 17, 1991. The third corporate partner's charter was forfeited on June 9, 1992.[3] Assuming, without deciding, that the partnership was dissolved when the corporate charters of two of the partners were forfeited, the partnership continued to exist during the period of winding up until all preexisting matters were terminated. *See Woodruff v. Bryant*, 558 S.W.2d 535, 539 (Tex.Civ. App.—Corpus Christi 1977, writ ref'd n.r.e.). This lawsuit was filed in the name of the partnership to recover damages allegedly resulting from a transaction between the partnership and the defendants. We hold that the institution of this lawsuit was a part of the winding-up process of the partnership. We overrule TWC's first issue.

## II. BREACH OF CONTRACT

In its second issue, TWC contends that there was legally and factually insufficient evidence to support the jury's finding that TWC breached the contract with appellee. We follow the usual standard of review for legal and factual sufficiency. *Plas–Tex.,*

*Inc. v. United States Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989); *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex. 1983).

### A. Profit and Loss

■ TWC first argues that the monthly profit and loss statements were properly calculated because the agreement unambiguously required the partnership to participate in the losses as well as the profits. The December 1992 statement of account shows a total balance of $234,714.31 to be charged against the partnership's future profits. TWC asserts that the language of the profit participation agreement referring to "profits and losses" supports its contention.[4]

The profit participation agreement designates certain expenditures to be considered capital expenditures and not to be charged against "profits and losses of Club operations." It also designates certain expenditures as "costs of operation in determining profits and losses." It provides, "Buyer will render a full and complete monthly accounting of profits and losses incurred not later than the 1st day of the second month following the period for which the accounting is rendered." With regard to the distribution of profits, the agreement provides

4. . . . Payments of profit distributions will be made at time of delivery of the monthly accounting. Such payment will

3. Although TWC refers to the third corporate partner as MA Corporation and argues, without supporting evidence, that it is a foreign corporation not registered in Texas, Defendant's Exhibit 3 contains a certificate from the Texas Secretary of State certifying that MA Partners, Inc. filed articles of incorporation on June 21, 1990, and that its charter was forfeited June 9, 1992. The attached Articles of Incorporation show that Bob Mousa was President, Trustee, and the Incorporator. Exhibit 3 also contains a certificate from the Secretary of State certifying that

there is no corporation registered in the State of Texas under the "exact name" of MA Corporation. We consider these certificates to be some evidence that the use of the name "MA Corporation" on documents prepared by TWC and in eliciting testimony at trial to be merely a misnomer.

4. Fairchild testified that he did not intend to try to collect these losses from the partnership until after it filed its lawsuit against him and TWC.

be received and distributed by the Trustees ... in accordance with the terms of Paragraph 7, hereof. . . .

5. Based upon the monthly accounting rendered pursuant to Paragraph 4, above, Buyer shall render to the Trustees that portion of the profits and losses of the business operation. . . .

. . .

7. ... The Trustees will be charged with ... distributing profits and proceeds, if any, to the [partnership] or the [partnership's] designees. . . .

No provision is made in the agreement for any payment by the partnership to TWC for any share of any operating losses of the club.

The parties did not argue at trial, nor do they assert here, that the agreement was ambiguous. However, in contrast to TWC's argument, the partnership contends that, according to the agreement, they were to participate in the profits only, and not in the losses. They cite *Gutierrez v. Yancey*, 650 S.W.2d 169 (Tex.App.—San Antonio 1983, no writ), in support of their contention.

*Gutierrez* involved a farming agreement among three participants in which one person was to advance capital for an onion crop. *Id.* at 171. After the crop was marketed, his capital would be repaid and the profits would be divided among the three participants. *Id.* Gutierrez advanced $131,987, but no profits were realized. *Id.* Gutierrez then sued the other two, claiming that they were liable on the loss. *Id.* at 170. The court of appeals held that, because the agreement contained no provision obligating the parties to share the losses, the expenses were to be paid solely by Gutierrez. *Id.* at 172. The court stated that the trial court could have construed the agreement as one to share profits as compensation under a profit sharing agreement. *Id.*

In this case, like *Gutierrez*, there is no provision obligating the parties to share losses. The agreement of sale specifically provides, under section 2, Payment, "The parties hereto agree that the full consideration set out in Paragraph 1, above shall be paid as follows: a) At closing, Buyer shall execute and deliver a Profits Participation Agreement in favor of the [partnership]. . . ." Thus, the agreement to participate in profits was a consideration for the sale of the business and did not imply an agreement to share in any losses incurred by the club. *See id.* at 172. Accordingly, we hold that, under the facts of this case, the partnership was not liable for the losses of the club.

### B. Jury Question and Evidence

Jury question number one in the charge reads as follows:

#### Question No. 1

Do you find from a preponderance of the evidence that Texas Westheimer Corporation breached the Agreement in its calculation of any amounts due and owing on a monthly basis that was a producing cause of monetary loss to plaintiffs, 5647 Westheimer Associates?

Answer: <u>We do.</u>

The evidence shows that when negotiating their agreement of sale, the partnership initially agreed to sublease the premises at 5647 Westheimer to TWC and signed a sublease agreement with TWC. However, the landlord refused to agree to the sublease. As a result, TWC negotiated a new lease with the landlord, releasing the partnership from any obligation on the original lease. The new lease was for a higher base rent with additional rent payable depending on gross sales of the club. In an addendum to the agreement of sale, the partnership agreed to the deduction of this excess rent from their share of the profits.

Moore testified that TWC's monthly profit and loss statements deducted the full amount of the rent paid as operation expenses. Then, after profit (or loss) was calculated, the excess rent was subtracted from the partnership's share of the profits. Moore referred to this as "double dipping." TWC's expert agreed that the excess rent was improperly calculated, and that the original base rent of $16,000 per month should have been entered in the profit and loss statement. Then, all excess rent should have been subtracted from the partnership's share of the profits.

We hold that the assessment of losses against the partnership, and the improper calculation of excess rent, constituted legally and factually sufficient evidence to support the jury's finding that TWC breached its contract with the partnership. We overrule TWC's second issue.

### III. FRAUD

In its fifth issue, TWC contends there is legally and factually insufficient evidence to support the jury's finding that TWC committed fraud against the partnership. In its sixth and seventh issues, TWC contends that, in the absence of fraud, there is no tort upon which punitive damages may be awarded.

Jury question number two in the charge reads as follows:[5]

Question No. 2

Do you find from a preponderance of the evidence that Texas Westheimer Corporation committed fraud against 5647 Westheimer Associates that was a proximate cause of monetary loss to Plaintiffs' 5647 Westheimer Associates?

Answer: "We do" or "We do not"

Answer: We do.

Instructions:

You are instructed that fraud occurs when:

1. A party makes a material misrepresentation;

2. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion;

3. the misrepresentation is made with the intention that it is to be acted on by the other party; and

4. the other party acts in reliance on the misrepresentation and thereby suffers injury.

"Misrepresentation" means a false statement of fact or a promise of future performance with an intent not to perform as promised.

■ It is undisputed that David Fairchild controlled all the financial information for the three involved corporate entities: (1) Defendant Texas Westheimer Corporation (TWC)—owner of the nightclub Baby'O; (2) Texas Richmond Corporation—owner of The Men's Club; and (3) TRC Management Consultants, Inc. (TRC). Fairchild was responsible for the day-to-day business of the three corporations.

On May 14, 1990, Fairchild, on behalf of Defendant TWC (which was formed to own and operate Baby'O) executed the profit participation agreement and the sale contract that are the subject of this litigation. Two weeks later, on May 25, 1990, the Internal Revenue Service seized records from Fairchild's office. Fairchild was subsequently indicted for conspiracy to defraud the United States by skimming cash from several sexually oriented businesses, tax evasion, and illegally structuring finan-

---

**5.** Jury question number two sets out the elements of common law fraud. *See Formosa Plastics Corp. v. Presidio Eng'rs and Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex.1998).

cial transactions from December 1980 through August 16, 1990. Among the documents seized from Fairchild's office by the IRS on May 25, 1990, was a handwritten memorandum relating to the purchase of the nightclub involved in this case. The memorandum, authored by Fairchild, detailed a plan to "divert more revenue out of" the nightclub to one of Fairchild's other corporations.

The expert witness for plaintiff testified that approximately $400,000 in checks had been written from the nightclub's account to TRC Management; however, the expert could not tell where the checks were deposited or where the money ultimately went because defendant failed to produce copies of the reverse sides of the checks. Defendant claimed the bank statements for the relevant time period were missing these checks, and only copies of the front of the checks were provided in response to pretrial discovery. Upon reviewing the front and reverse sides of plaintiff's exhibit 29, a check from defendant's operating account "payable to Kevin Hurst," but deposited into another of defendant's accounts, plaintiff's expert explained to the jury that this was an example of a method used by defendant to move cash from one of its accounts to another, through use of a check payable to a third party, but endorsed over to defendant. Without the reverse sides of the $400,000 worth of checks payable to TRC Management, the expert could not tell whether the checks were actually deposited to TRC Management's account for legitimate charges arising out of the management of the nightclub, or whether the checks were endorsed and deposited into other accounts controlled by Fairchild. It is uncontested that, in the accounting prepared by defendant, the $400,000 in checks were shown as expenses of the nightclub, thus reducing profits. In light of the impeachment of Fairchild's credibility, the jury may well have disbelieved Fairchild's assurance that the $400,000 was properly charged against profits of the nightclub.

Plaintiff argued to the jury that in order to induce plaintiff to sell the nightclub, defendant had fraudulently misrepresented that it would report profits accurately and without add-on costs and in accordance with generally accepted accounting principles. Further, defendant had misrepresented that Fairchild's "proven track record" would afford plaintiff the opportunity to make a handsome return on its previous investment. In actuality, Fairchild had a track record for tax evasion and cash skimming.

Plaintiff rejected other potential offers, opting to sell the club to defendant. Plaintiff received "zero" distributions of profit, because the accounting provided by defendant indicated there were no profits to distribute. Defendant's own expert acknowledged that the accounting provided by defendant incorrectly allocated rent expenses, resulting in a "double dipping effect." The evidence showed that, after six months of operation, the nightclub was ranked number three in liquor sales in Houston, yet the accounting provided by defendant still showed no profit.

We conclude the evidence is legally and factually sufficient to support the jury's findings that defendant, through Fairchild, made material misrepresentations to plaintiff, knowing they were false and with no intent to perform as promised, with the intent that plaintiff act in reliance thereon, and that plaintiff did act in reliance on the misrepresentations to its detriment. Accordingly, we overrule defendant's fifth, sixth, and seventh issues.

## IV. ACTUAL DAMAGES

In issue number three, defendant contends there is legally and factually insuffi-

cient evidence to support the jury's award of actual damages in the amount of $464,963.83.

Jury question number three in the charge reads as follows:

If you have answered either question no. 1 (breach of contract) or no. 2 (fraud) "We do" then and in that event answer the following question: otherwise do not answer the question:

Question No 3

Find from a preponderance of the evidence the amount of money, if any, which if paid now in cash would fairly and reasonably compensate 5647 Westheimer Associates, Plaintiffs, for monetary loss, if any.

Answer in dollars and cents, if any.

Answer: $464,963.83

■■ Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the bargain measure. *Formosa Plastics Corp.v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 49 (Tex.1998). The out-of-pocket measure allows the injured party to recover the "actual injury" suffered measured by the difference between the value of that which he has parted with, and the value of that which he has received. *Id.*

■ It is uncontroverted that plaintiff parted with a capital investment of more than $600,000 and it received "zero" distributions of profits. There was evidence that the location of the club was a much sought-after spot, and several club operators approached plaintiff about subleasing or buying the club's assets, including representatives of Rick's Cabaret and Dream Streets. Plaintiff chose to sell to defendant based on the representations made. In our opinion, the jury could have reasonably concluded that $464,963.83 was a proper amount to compensate plaintiff for

its out-of-pocket losses as a result of defendant's fraud.

Further, in light of the jury's breach of contract finding, plaintiff argues that the jury's award is within the "range of credible evidence," citing *New Process Steel Corp. v. Steel Corp. of Texas, Inc.,* 703 S.W.2d 209 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd, n.r.e.). In *New Process,* this Court held there was legally and factually sufficient evidence to support the jury's finding on damages because three different elements of damages, when added, totaled slightly more than the amount the jury awarded. *Id.* at 215.

Plaintiff argues that, in this case, like *New Process,* when three separate elements of damage are added, the sum is more than the jury award, and, therefore, the award is supported by legally and factually sufficient evidence. These three elements, according to plaintiff, consist of (1) $346,068.07, which, according to Moore, they are entitled to under the profit participation agreement; (2) $118,313.79 in losses "which the jury could have reasonably believed constituted capital expenditures that belonged to defendant;" and (3) "damages in excess of $5,000" resulting from defendant's failure to "comply with other provisions of the agreement." The total of these figures is $469,381,86, which is more than the jury award. The jury could have reasonably reached the damage amount in the manner proposed by plaintiff.

We overrule issue three.

## V. WAIVER

■ In its fourth issue, defendant contends the partnership waived its complaints regarding the monthly financial statements because the profit participation agreement provided, "Objections to accounting shall be referred to the Trustees within thirty (30) days for investigation

and resolution." The agreement does not provide a time period for the trustees to present the objections to TWC or for the investigation and resolution of the objection. It does not require that the objection be in writing. There is no provision for a penalty for any delay in making an objection, and there is no suggestion of waiver.

■ Waiver is an "intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Sun Exploration & Prod. Co. v. Benton,* 728 S.W.2d 35, 37 (Tex.1987). In determining whether a waiver has occurred, a court considers the acts and conduct of the party at issue to determine if its conduct unequivocally manifests an intent to relinquish the right at issue. *See Robinson v. Robinson,* 961 S.W.2d 292, 299 (Tex.App.—Houston [1st Dist.] 1997, no pet.).

The partnership received its first monthly profit and loss statement in November 1990. The first written documentation of a complaint or objection is a letter from Woodall to Fairchild on February 6, 1991. It references a meeting in January between the trustees, representatives of the partners, and Fairchild. After further correspondence, Fairchild discouraged further questioning by threatening to charge an administrative fee for his time. Under these facts, defendant has not conclusively shown that the partnership manifested its intent to no longer assert its claim. *See id.*

We overrule defendant's fourth issue.

We affirm the judgment.

Justice NUCHIA concurring and dissenting.

NUCHIA, Justice, concurring and dissenting.

I concur with the majority opinion regarding standing (issue one), breach of contract (issue two), and waiver (issue four). However, I must dissent to the majority's holding on the issues of fraud (issues five, six, and seven) and damages (issue three).

**FRAUD**

Of all the statements made in the majority opinion regarding the issue of fraud, only two relate to representations by or on behalf of defendant: (1) that TWC would report profits accurately, and (2) that Fairchild had a "proven track record" that would give plaintiff the opportunity to make a handsome return. The record contains only two references that can be considered evidence of Fairchild's "track record." The first was Fairchild's testimony that he had managed night clubs and sexually oriented businesses from 1980 to the time he made the representations. Plaintiff did not inquire of him whether, under his management, these clubs and businesses were successful. Plaintiff also did not present any evidence that they were not.

The other reference in the record relating to Fairchild's past involvement with clubs and sexually oriented businesses was his testimony acknowledging that he pleaded guilty to participating in the underreporting of the income of several clubs in order to reduce the clubs' income tax liability. Plaintiff made no inquiry as to whether this underreporting negatively affected the success of these clubs and did not present any evidence that it did. Plaintiff presented no evidence showing that the clubs Fairchild managed were unsuccessful or unprofitable. Therefore, plaintiff did not carry its burden to establish, by a preponderance of the evidence, that the representation that Fairchild had a proven track record was false. The representation cannot be the basis for a finding of fraud.

The question then becomes, whether TWC's assurance that it would report profits accurately was a misrepresentation as defined in the jury charge.

### Reporting of profits

The jury charge defined "misrepresentation" as "a false statement of fact or a promise of future performance with an intent not to perform as promised." Defendant's representation—that it would report profits truly and accurately, without surcharge, hidden or add on costs—was related to future performance. Therefore, plaintiffs were required to produce some evidence that defendant, at the time the promise was made, intended not to perform that promise. The majority finds evidence of such intent in a memorandum written by Fairchild. That memorandum referred to diverting "more revenue out of" the nightclub. Plaintiff claims, and the majority agrees, that this memorandum is evidence that Fairchild's intent, from the beginning, was to divert revenue from TWC to TRC Management Consultants for his benefit.

In actuality, this five-page, hand-written memorandum relates to the relationship between the partnership and Fairchild. The words "divert more revenue out of" cited by the majority are contained in one sentence of the memo. That one sentence, taken out of context, was also referenced frequently throughout the trial as evidence that Fairchild never intended to honor his agreement with the partnership, and was, thus, evidence of fraud in the inducement.

The memorandum begins with notations regarding square footage, rent, and taxes. It then provides, in pertinent part:

> Existing partnership retains 20% stock in new corporation until old partnership has return of 500,000. An additional 13% bonus of net will be paid until existing partnership receives 500,000. At which time full title of all equipment will be delivered to new corporation.
>
> TRC Management Consultants will enter in a management contract with the new entity to operate the club for a set fee or % of gross. *This will allow us to divert more revenue out of the new entity.*
>
> Existing debt is approx. 80,000. We should be able to negotiate this down to say 40,000. and recoup that 40,000 from the existing partnerships 1/3 of initial profits. Possibility have current partnership sign a note to new entity for the 40K.
>
> We would be responsible for all interior refinishing and updates, and initial operating capital.
>
> The existing partnership would have no control on operations and would be considered "silent" partners.

(Emphasis added.) The memorandum continues with notes on improvements to be made, surrounding businesses and other establishments, parking, and what appears to be some preliminary projections of profits. Page three of the memo contains calculations of anticipated profits over a five-year period and the division of the profits between Fairchild and the partnership. This is what the majority calls a "detailed plan to divert more revenue out of the nightclub to one of Fairchild's other corporations."

During trial, the partnership emphasized the highlighted sentence to the jury, arguing it showed Fairchild planned from the beginning to set up a separate company to divert funds out of the club to the detriment of the partnership. However, read in context, the phrase "divert more revenue out of the new entity" is not evidence that Fairchild made any promise to the partnership with the intent not to perform as promised. Any speculation that the reference, "divert more revenue,"

shows intent not to pay a share of profits to the partnership is negated by the calculations of anticipated payment of the profits. I would hold that this memorandum is not evidence that defendant intended not to perform his promise.

### Credibility

The majority also assails the credibility of Fairchild in connection with his testimony regarding the payment of $400,000 to TRC Management for reimbursement for TWC's payroll expenses. TWC did not produce copies of the reverse sides of the checks drawn on TWC's account for this $400,000, and the majority notes that the jury may not have believed Fairchild's explanation of the use of the checks.

I do not dispute that the jury did not believe, and was entitled not to believe, Fairchild. However, plaintiff had the burden of proof at trial. The record does not indicate that plaintiff filed a motion to compel production of copies of the reverse sides of the checks or that plaintiff subpoenaed these documents from defendant's bank. On October 17, 1996, 11 days before trial, plaintiff filed a motion for sanctions arguing that defendant had not complied with an April 1994 order compelling production of documents. The record does not contain an order granting plaintiff's motion. Plaintiff produced no evidence to show that the $400,000 was not used to properly reimburse TRC Management for payroll expenses.

That "the jury may well have disbelieved Fairchild's assurance" regarding the use of the $400,000 is not evidence of any misrepresentation made by defendant to plaintiff. The jury's disbelief of Fairchild's explanation is not evidence of fraud. *See Casso v. Brand,* 776 S.W.2d 551, 558 (Tex. 1989); *see also Louisiana Pac. Corp. v. Andrade,* 19 S.W.3d 245, 247 (Tex.1999). Regardless of Fairchild's credibility, or lack thereof, the burden remained on plaintiff to produce some evidence of fraud.

I would hold that plaintiff produced no evidence to support the jury's finding of fraud. Without proof of fraud, the award of exemplary damages cannot stand. I would sustain appellant's fifth, sixth, and seventh issues.

### Damages

The jury question on damages was predicated on an affirmative finding to the question on breach of contract or the question on fraud. The partnership argues in its brief that it "paid or parted with a $800,000 investment" because of TWC's misrepresentation. This argument relates to damages resulting from fraud rather than breach of contract.

I disagree with the majority's conclusion that plaintiff's loss of its initial capital investment of $600,000 and the fact that there was no distribution of profits supports the jury's award of $464,963.83 in damages for out-of-pocket losses as a result of TWC's fraud.

At trial, Siam testified that the partners made an initial investment of $600,000 and an additional $100,000 each. They opened as Humphrey's in late 1989, operated at a loss, and knew by January 1990 that the club would not be profitable. They changed the name and format to open as 101 Café, but this club, too, operated at a loss. The evidence is clear that the partnership sustained significant losses before it met Fairchild and, at the time it was negotiating with Fairchild, was in debt for at least $114,000.

Even if there were some evidence to support a finding of fraud, there is no evidence to support an award of $464,-

963,83 in damages.[1] There was no evidence to establish the value of the assets of the partnership at the time they were assumed by TWC, and, thus, no basis on which to measure out-of-pocket damages.

An award of $464,963.83 in damages for breach of contract is also not supported by the evidence. Plaintiff argues, and the majority agrees, that the jury's award is within the "range of credible evidence," citing *New Process Steel Corp. v. Steel Corp. of Texas*, 703 S.W.2d 209 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd, n.r.e.). In *New Process*, this Court held there was legally and factually sufficient evidence to support the jury's finding on damages because three different elements of damages, when added, totaled slightly more than the amount the jury awarded. *Id.* at 215.

The partnership argues that, in this case, like *New Process*, when three separate elements of damage are added, the sum is more than the jury award, and, therefore, the award is supported by legally and factually sufficient evidence. These three elements, according to the partnership, consist of (1) $346,068.07, which, according to plaintiff's expert, Victor Moore, they are entitled to under the profit participation agreement; (2) $118,313.79 in losses "which the jury could have reasonably believed constituted capital expenditures that belonged to TWC"; and (3) "damages in excess of $5,000" resulting from TWC's failure to "comply with other provisions of the agreement." The total of these figures is $469,381,86, which is over $4,000 more than the jury award.

A review of the record reveals that the $346,068.07 in profits is a number arrived at by Moore by disallowing over $400,000 in checks written on TWC's accounts, although the partnership produced no evidence that any of these checks were written for · an improper purpose.[2] Moore testified he did not know what they were used for or where they were deposited because he did not have copies of the backs of the checks. Moore's testimony is not evidence of any improper use of the $400,000.

Moore testified that, according to his calculations, the club had a negative balance in October 1990 of $118,313.79. This figure included $110,000 advanced to the partnership by Fairchild for the payment of their debts and the offset made by Moore for the checks written to TRC for consulting.[3] This negative $118,313.79 was a part of Moore's calculation of the $346,068.07 in profits owed to the partnership. Thus, the $118,313.79 cannot be added to Moore's calculation to support the damage award.

I am unable to determine any arguable damage figure in the record, in addition to those already discussed, in the range of $5,000. This miscellaneous $5,000 cannot be used to support a damage award.

1. Likewise, the suggestion that the operators of one of the other two clubs that approached Siam (Dream Streets and Rick's Cabaret) would have been more successful and that the partnership would have recouped its loss is merely speculation and cannot be the basis of an award for damages.

2. Checks in the amount of approximately $400,000 were written to TRC Management Company, a corporation formed for the purpose of employing management personnel that were shared by The Men's Club and Baby'O. Payroll records of TRC Management Company, admitted as evidence, cover payroll for Cutter Bill's and The Men's Club up to March 24, 1991, and for Baby'O and The Men's Club after March 25, 1991.

3. The partnership agreed, in the profit participation agreement, that the advanced money would be charged against their profit distribution account. Moore properly credited TWC with this amount.

The profit sharing agreement provided for a determination of profits on a monthly basis. There was evidence that the night-club operated at a profit in some months. This evidence, and the evidence of the improper offset of excess rent is some evidence that the partnership incurred damages as a result of TWC's breach of contract. However, the evidence is factually insufficient to support the amount of damages awarded by the jury. I would sustain appellant's third issue.

## CONCLUSION

I would reverse the judgment of the trial court awarding exemplary damages and render judgment that the partnership take nothing on their claim for fraud. I would also reverse the judgment's award of actual damages and remand the cause for a new trial on the partnership's claim for breach of contract.